Next matter, number 171515, Mary Barchock et al. v. CVS Health Care Corporation et al. Good morning, Mr. Kim. Good morning, and may it please the Court, my name is Jason Kim. I'm representing the plaintiffs in this action. This is a putative class action under ERISA solely for breach of the duty of prudence. And this case involves the CVS Stable Value Fund, and in a general sense involves the underlying financial logic behind Stable Value Funds, which I'll go into in the second part of my argument. I forgot I would like to reserve two minutes for rebuttal, please. You may. So I wanted to begin before we jump into the world of Stable Value Funds with talking about, from a very practical perspective, how one does and how one should frame and investigate a complaint for breach of the duty of prudence. I know the Court and Amity and the defendants have characterized this case as solely being about underperformance. As we've explained, that's not really true, but it's certainly true that the first step is you don't have a case unless you observe that there's something going on, that someone was harmed in the sense they got less money in their retirement than they should have. The next step, then, is to investigate, come up with a hypothesis why was there underperformance. What we did here is, and again, this is just a step in the process, is we look at how does the composition and certain objective characteristics of this particular Stable Value Fund compare to other Stable Value Funds. And we look at data from the Stable Value Investment Association and from the Hewler Analytics Survey, where they aggregate information about a number of funds. Let me ask you about that. Sure. It seems the essence of the complaint, and I quote from page two of the brief, is that they departed radically from fundamental guidelines and industry standards. Yes. And so to support that, the allegation in the complaint points to average figures from those companies that responded to a survey. Yes. That doesn't quite do it for me. I need to know how many companies, how representative of the survey results, but more importantly, what's the distribution curve? And then what's our measure of sort of how many standard deviations outside of that curve or at the edge of that curve do we need to be before we start saying that something is departing radically? I don't find any of that in the complaint. Sure, Your Honor. That's a very good point. In fact, there was a colloquy with the district court about a similar issue when the court asked, you know, what more could you do in terms of additional detail? And I said, well, in theory, I'm not sure if I have the data to do that kind of distribution. You know, suffice to say that that information does not exist. We are using raw averages. Can I ask you before you, just on that point? Sure. One thing that was puzzling, though, is in identifying the average, you also identified the range. Was it something like 25 to 55? Or 25 to 48? You know what I'm talking about? I think Your Honor is referring to actually what the defendants identified. So I can address that within the proper context. In terms of, well, let's be very specific here so we're all on the same page. I believe that the figure you're referring to, and I could be wrong, is the distribution of cash allocation among stable value funds. I don't think that in our amended complaint or in our briefing we referred to the range. I think we always refer to the average. I think it was the defendants that looked at the underlying survey data and gave you the range. That's what I'm saying. It seems like it was available to you. Sure. So Judge Gattas' question was, you've given me the average. Yes. What about the range? Sure. And the distribution within that range. And then I thought your response was, well, I don't really know if that would have been available to me. But it looks like it is available to you. I'll tell you. And since it's an available thing, if you just give the average to say it radically departs without saying anything about the distribution when that was available to plaintiff, that just seems problematic to me. Well, let me tell you what is available. I don't know that the distribution is available in the sense of having every data point. What is true is the defendants, and this appears in their supplemental excerpts of record, they do cite a range of cash holdings. And the range, just to be clear, the information that's provided is the minimum and the maximum. So there are two issues there. One is how, you know, the effect of that range on the merits of the claim. But the second issue, which I'll go to in a minute, but the second issue, though, is going to the pleading standard, which is, you know, do we need a statistical analysis where you have a number of data points and you say that this particular fund was within one or two or one and a half standard deviations from the average. I'm not aware of that ever having been required. What I will tell you we did in this case, and this is why it's important, as I noted, that the relative composition or how it compares to the average is merely a step in the analysis. And, in fact, I think there are maybe two paragraphs in the entire complaint that make that analysis. I think the more fundamental point, though, you know, the average analysis feeds into that. The more fundamental point, though, is the nature, that is, what are the issues on which there was some deviation and how important are those issues. So to get back to what I was saying about the process of developing and investigating and pleading and a risk of prudence claim, if you develop a hypothesis using, among other things, you know, data about what's going on in the industry, you know, it's certainly possible for a fund to have underperformed, for example, because they chose to invest in a particular guaranteed investment contract by an insurance company that had financial problems. Or they chose, you know, this kind of bond instead of that kind of bond in terms of industries, and that particular bond didn't do well. But what we see here is the reason that there's the underperformance is for unknown reasons this particular manager chose to invest, you know, at most about 50% in cash. And that's why really most of the complaint, most of the argument, I think, really isn't so much about the comparison, but it's about why this does not make any sense to have that much cash. If we were to accept that, would it follow that it would therefore be a breach of ERISA duties to have a menu of investment options in a D.C. plan that included a money market fund? It seems it would. Your argument is that you can get at no additional risk higher returns if you already inherently have an equity wash type or some other restraint on withdrawals, which you generally do in a defined contribution plan. Sure. So we would, in effect, hold every plan in this country that offers its recipients anything like a money market fund is in breach of ERISA? So, Your Honor, first, and you may be aware of this, there are a number of cases working their way through the system that do, you know, make that allegation, which is that you should, you did, as a plan sponsor, by offering a money market fund rather than a stable value fund. Off the top of my head, I'm not involved in those cases. I don't know. I can't tell you how successful they've been. But the concept that you've delineated, although intuitively it may seem sort of ridiculous, I think, by the way you framed it, that is a claim that has been brought. Well, I didn't mean to frame it as intuitively ridiculous, but I'm putting forward the proposition. It may, in fact, be correct as a matter of sort of complex investment strategy that when you think it all the way through, if you buy your argument that there's no incremental risk that it would, therefore, follow that, why would anyone want that? And then you get to the question of whether there is, in fact, a fiduciary duty when it comes to structuring as opposed to operating the plan. Sure. But it's quite a leap to go from saying here's some sort of cutting-edge theory that we have about investing that does not necessarily seem to be generally accepted. You've, quote, two articles essentially written by the same guy on the no risk. That not accepting that theory is a breach of ERISA duty is quite another step altogether. Yeah, thank you, Your Honor, and that's an important clarification. So it's certainly the case that I would say, you know, in the abstract, that offering a money market fund rather than a stable value fund is not by itself a breach of fiduciary duty. It may be, for example, if that stable value fund option was not adequately considered. But I think the underlying point, though, which is a good one and leads me to the next step of the analysis, which is, okay, are you saying that a money market fund is necessarily inferior to a stable value fund because a stable value fund offers the potential for greater returns with no incremental risk? That is not our position here. Our position here, though, is that words have meanings and that one way you can judge and you should judge the duty of prudence is by looking at, for a particular type of investment, what are the basic parameters of that investment? What is the basic financial logic of that investment? And practically speaking. When you say words have meaning, though, then it starts to sound like we're moving from one section to ERISA from another. It sounds like we're moving from the prudent section to misleading plan participants by telling them you're doing one sort of fund when de facto you do another. Then you get into issues of reliance and the like. Presumably for that reason you're not pleading that theory in a class proceeding. So I come back to really your theory is that you can't offer a money market fund or a stable value fund that has a low, like 2% instead of 3% interest. Okay. So I think what's instructive, though, in terms of the first point you made, which is the distinction between a prudence claim and a misrepresentation claim, is if you look at the class certification opinion by the Seventh Circuit in Abbott and this distinction there is addressed. The point was on class certification what the defendant was saying, well, this is really about a misrepresentation because you called it a stable value fund, but in fact it was managed as a money market fund. And I think the Seventh Circuit understood that, no, that wasn't the claim. And that you can have a prudence claim because one thing that you're looking at when you're evaluating prudence is you're not evaluating prudence in the abstract. You have to evaluate or should evaluate prudence with respect to both the stated and the implicit character and aims is the phrase that's used of a particular investment advice. And so with an array of investment advices, they're all intended to have some kind of parameter. And that's different. And so that is sort of an issue of sort of industry. That's helpful to me. It makes sense to me. So if we have a prudence claim here and then the issue is how poorly managed was this stable value fund and you're effectively saying it was so poorly done that it was imprudent because it looked so much like a money market fund. Exactly. Okay, so if that's the argument, the whole thing turns on how much like a money market fund does it have to look like to get you past the motion to dismiss. And what I'm trying to figure out is besides the argument that many stable value funds look a lot less like or the average of all stable value funds, which doesn't exist, but that average non-existent fund looks a lot less like a money market fund than this does. You then say that creates an inference that it was imprudent to structure it this way. Is that right? Yes, for purposes of a motion to dismiss. If we thought that the average doesn't really do it because what you really want to know is how many stable value funds are out there that actually look a lot like this stable value fund, what in the complaint helps me figure that out? Sure, and I think this comes down to using some common sense. If the average is 10%, you can make some, and I think it's maybe even less as we've stated, and then you have 50%. I mean, do you need statistical analysis to see that 50% is a lot different than 10%? Well, it depends. If there was 500 of them and 30 of them are at 48% and you're at 55%, when you say it's radically different than what people do, it just doesn't, you know what I'm saying? Sure, but how mathematically do you get a 10% average if you have a lot of places that are 50%? The actor who would be proposing the test to us would be the plaintiff. Sure. So that's what I guess I'm asking. One test you propose is take the average of some survey, and if you're very far from the average, that creates an inference of imprudence. And if I thought, gee, that doesn't really do it for me, is there anything else that you're offering? Absolutely, and that's why there's so much discussion of the underlying financial logic, and I would urge the court to think through that aspect of it and just look at that survey data, which, again, was two paragraphs of a fairly lengthy complaint, as just corroborative of logic. And the reason that the 50% of cash is significant is not because it's different, it's because it's fundamentally illogical given the academic literature about why are stable value funds attractive, and that is the yield curve and avoiding the liquidity premium. When you're at 50% cash, you are, by definition, at a very low duration, and you are, by definition, paying a huge liquidity premium. That's completely unnecessary. Is there a consensus among economists that it's the liquidity premium that entirely accounts for the differential in the yields? No, Your Honor. In fact, there are a number of factors, one of which is the liquidity premium, the other of which is the yield curve. And then there's the ability to take a certain incremental amount of risk that's not really appropriate for money market funds. So I don't want to suggest that the sole advantage of a stable value fund is in the yield curve or the liquidity premium or the combination of the two. There are other factors that go into it, including some of the structural factors that are described in the complaint, but the liquidity premium and the yield curve are certainly very important factors. Let me ask it this way. Is there consensus that you can go from a 50% cash investment in a stable value fund to 10% and not incur any additional risk? So I think, Your Honor, the issue is obviously having a lot more cash would reduce your risk. No one disputes that. But it's what is the appropriate amount of risk given the nature of the product. If your only goal is to completely avoid risk, you can put your money underneath your mattress, right? But the reason people invest in financial products is because they have certain specific goals. So I think we look at risk in this context as this horrible thing that has to be avoided. I'll tell you that if you talk to a finance professional, for example, in this context, they would say, well, risk doesn't mean anything more than duration. And the whole point of this product definitionally is to have a short to intermediate duration. So if you're completely avoiding risk, you're not offering the product that you say you're offering because if you're completely avoiding risk, that means you don't have any duration. That's why if you had 100% cash, you'd have a really good claim.  But the issue for us, if you were at 10%, 12%, 18%, I mean, in other words, it's a motion to dismiss, but there's got to be a legal standard at which point it is possible to say that it's imprudent. And I guess I'm just struggling to figure out where do I get purchase on that. Understood. And I think, again, the way I would frame it and the way I would think about it is not focus so much on the exact percentages and how that compares to industry averages, but think about it more from the other side, which is what is the nature of this product? And I think we've provided a lot of background. Given that nature, what can you infer at this point about what are some reasonable parameters? And with respect to the exact percentages, I guess as I said in the brief, you know, to me it seems, turning your question around, you know, how can you have this Abbott case where the range was 50 to 99 and that, you know, goes past all these motions, it gets certified, it settles for several million dollars. In our case, I think our range is something like 28 to 50. And you say, well, that categorically, you can't even take any discovery. You're completely done. I mean, what about that those range of numbers is so significant, you are 100 percent sure that I don't have any kind of viable case. And it seems like that kind of analysis is not appropriate for a motion to dismiss. It's a phrase I keep using is it's a matter of degree, not a matter of kind. And you can't, I don't think, adjudicate a matter of degree on a motion to dismiss. Thank you very much for your indulgence on the extra time. And I will, you know, given the additional time you've given me, I won't be doing any rebuttal. I think that's appropriate. Thank you. Good morning, Your Honors. Megan Vergao for the Appellees. May it please the Court. There is a test that courts have applied in analyzing claims like this one, and that's whether the fund was structured to meet its investment objectives. That's the substantive arista duty that's described in the Department of Labor's regulations setting forth the duty of prudence for an investment fiduciary. The question is whether the fund was reasonably designed to further its purposes here. It's undisputed that the stable value fund, which was this plan's capital preservation option, the safe option for retirees, both was structured to meet its capital preservation objective and its objective of delivering returns higher than a money market fund, and that it did, in fact, meet those objectives throughout an incredibly trying market conditions. This one, oddly, unlike most of the others, didn't have a benchmark for several of the years. Then in 2013, I think it is, it appears a benchmark suddenly gets added. What are we to read into that in terms of, so at least with a benchmark, we know whether it's meeting or aiming at, but in the earlier years there's no benchmark. So I will have to confess a lack of familiarity with the introduction of a benchmark to this fund, and I apologize for not knowing that part of the record. But from what I know from the materials as they come to the court and as they were briefed below, the stated objective of this fund was simply to preserve the invested capital and to deliver returns higher than a money market fund. Now, if a benchmark was introduced, then I think that would be another measure that the fiduciaries would be bound by in making decisions about the reasonable design of the fund. But for the period of time in which it lacked a benchmark, then they had wide latitude to make risk-reward judgments. So just going to your standard, I mean, I'm sure you can anticipate the question, but if there's no benchmark and the question is it has to be better than a money market fund, suppose it's 90% cash. Does it survive a motion to dismiss if they plead that? So if it's 90% cash in one year. 90% cash all year? All year. I think that the fund in that event would be structured to meet its investment objectives. And absent further reason to believe that the fiduciary. Call it a stable value fund? Call it a stable value fund. I think it would be a more difficult question if the fund were 90% in cash over 10 years, and it was obvious that the fiduciaries weren't applying any process behind the scenes to modulate the level of cash to the market environment. But here, we're in the three years after the worst financial crisis in three generations. One of the major issuers of insurance contracts to stable value funds, AIG, had almost collapsed. So the environment that we're in is a discrete period of time in which the fiduciaries charted a more conservative course. And in a statutory environment in which a fiduciary is supposed to be careful, not bold, I think it's very difficult to infer that a period of conservatism suggests an improved process behind the scenes. I think what plaintiff described, plaintiff's counsel described- Just so I understand, does that mean for the period of time we're talking about, if it was for a three-year period, if it was 90% cash, you'd say it should be dismissed? I would say that's not this case. No, I know that's not the case. Right, but I think the way, I mean, this is the way the court analyzed it in Abbott, and I think it's the test that courts have applied in the few times that this type of claim has arisen, was to ask whether it was structured to meet its investment objectives. In Abbott, there was a serious question whether it was, in fact, structured to meet money market returns because there were periods of time in which it was a money market fund, it's nearly 100% invested in cash. And the way the Abbott court analyzed the claim was to deny that a plaintiff could come forward and just offer up a platonic ideal investment mix and say that the fiduciary departed from it, therefore we infer a breach of the duty of prudence. In Abbott, it was essential to the court's holding that the plaintiff was able to allege that the fund was not structured to meet its objective of beating money market returns. But it was based solely on the allocation percentages. That's right, but it's 99%, right? So that's what I'm trying to say, what's the cutoff? Here, the fiduciaries were charged with balancing competing interests under conditions of uncertainty, preserving the invested capital against loss, and delivering modest returns in excess of a money market fund. If I understand it, at least the range of allocation, in one year it's 55% cash, is that right? One year, it was a high watermark, 55%. If I understand it, even on your own account, you haven't identified a single other stable valuation fund that exists that had that high a valuation. For three of the four years at issue, we were within the range set forth in the survey. But in that first year, the first year after the financial crisis, that was the high watermark for cash in the fund. And if the court were to hold that that alone states a claim for breach of the fiduciary duty of prudence, here, where the fiduciaries were making decisions in the wake of a financial crisis, the inevitable result, I think, would be to place pressure on fiduciaries to take risks based on the decisions of others, others who are making their own investment decision based on considerations that the fiduciaries may not even have a line of sight into, others who may have investment objectives different from this particular fund. The survey that plaintiffs rely upon don't describe whether a separately managed account, for example, has an investment management agreement with its client, setting forth a more aggressive benchmark, for example. But the implication of the rule that says you go to discovery just by, you know, alleging a period of conservatism is that fiduciaries will feel confused about what their duty is and will feel compelled to embrace further risk precisely at the times when we understand ERISA directs them to exercise individualized judgment about what's best for their funds. Turning to the question of risk and structural features of stable value funds, I think there are four things that I would point the court to in the record to make clear that the fiduciaries here actually were weighing real risks against potential gains. One is the disclosures that are incorporated into the complaint, the 5500s, which describe the risk of catastrophic loss in the event that one of the insurance company counterparties to the guaranteed investment contracts fails. Another is plaintiffs' own conception in the brief and in the complaint that stable value funds, on the whole, whether the financial crisis, but there were a few exceptions. There were a few exceptions. One of them was the CVS plan's prior stable value manager who did not make it through the crisis intact. The other, you know, place I direct the court's attention to is the case brought against J.P. Morgan by this plaintiff's counsel alleging that J.P. Morgan took excessive risk in its management of the stable value. We're not going to be looking at allegations by plaintiff's counsel in another case. Why wouldn't we benefit by having let this move past the Rule 12 stage and go forward to Rule 56 so that we would know more of this information, like about what CVS's prior experience would have been? Also, I'm guessing there are some more documents out there that the participants see when they make these elections than those that have been provided to us. Might those have statements in them about the characteristics of the fund that would then become the test that we would use? I think there are three considerations. The first is legal, the second is practical, and the third is substantive. The legal consideration is the fact that courts are supposed to apply a probing examination of the allegations at the motion to dismiss stage. The Supreme Court in Dudenhofer and again in Amgen v. Harris articulated the prudent standard for plausibility purposes as the plaintiff must allege that no prudent fiduciary could have reached the decision subject to challenge. Here, where the allegations and the complaint itself establish that the fund was structured to meet its investment objectives,  the practical question is, and I thought it was interesting the way that plaintiff's counsel described the methodology behind the filing of this complaint, it will always be possible to identify in hindsight the element of risk taken or risk avoided that contributed to a fund's performance relative to peers, and stating that that is sufficient to state a claim will just invite litigation based on similar theories. And I think that practical concern leads to the substantive concern, which is one that I mentioned, I think, in my colleague with Judge Barron, which is that the substantive duty of prudence will be confused. Right now, fiduciaries understand that they are to exercise individualized judgment, balancing risk and reward under conditions of uncertainty based on needs particular to their own plans. If they are subject to a rule that suggests that they are open to question, if they simply departed from the average of peers, that imposes pressure on the fiduciary not to exercise individualized judgment contrary to the directions of ERISA. Just trying to think about what we know just from the complaint as it is. So we know from the complaint that the worst year, from your perspective, the 55 percent, is the year right after the crash? That's right. Do we know what was the fund in existence prior to the crash? It was. So it was managed by a different manager. Do we have any? I see. So that's right. And those facts are judicially noticeable. You can see it in the filings. They go away. In the filing itself? In the 5500s, the prior manager is replaced, and there are news articles from the time that describe the closure of those funds. But as the record comes to us, it's sort of unknown whether. It depends on Your Honor's interpretation of judicial notice, I think, at this point. And then the second, do you know what the, if you took the 55 percent year out, have you run the numbers so that we would then know how it compares to the average with that year gone? No, I haven't. I know, I mean, what we know from the survey is that for the other three years were within the range just stated in the survey. So from your account, what we can tell from the complaint is that the only reason that this is an outlier, if it is an outlier, is because of that first year? That's right. And just so I'm understanding, when it's comparing it to the other stable value funds, are those other stable value funds being compared for the same years? In other words, would they also include the year after the crash? So the survey that plaintiff offers covers only the years 2011 and 2012. It doesn't include data for 2010 or 2013. So we're jamming this into apples and oranges? We're looking at the data that we have. So I guess from your perspective, we might say whatever the general rules are for what you could get over, a motion to dismiss here, it's not enough because of, yeah. We would invite that holding. Thank you, Your Honor. Thank you.